In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3150

ANTHONY BOLTON,

*Petitioner-Appellant,*

*v.*

KEVWE AKPORE,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 05 CV 801 — **Blanche M. Manning**, *Judge.*

ARGUED APRIL 5, 2012 — DECIDED SEPTEMBER 12, 2013

Before ROVNER, WOOD, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Anthony Bolton was convicted of
first degree murder following a bench trial in the State of
Illinois in 1997. He now appeals from the denial of his petition
for a writ of *habeas corpus*. *See* 28 U.S.C. § 2254. Because he did
not preserve in the district court the issue he now raises on
appeal, and because he did not raise the issue he now asserts

through a complete round of state court review, we affirm the judgment of the district court denying the writ.

## I.

Factual determinations by state courts are presumed to be correct in federal *habeas corpus* proceedings, and the applicant has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Vasquez v. Hillery*, 474 U.S. 254, 258 (1986); *Sumner v. Mata*, 449 U.S. 539, 545-47 (1981). We glean the following facts from the unpublished opinions of the state court on direct appeal and in post-conviction proceedings. In the evening of October 21, 1994, Brandy Smith and Daccheus Birmingham were driving near 101st Street and Cottage Grove Avenue in Chicago. They pulled into the London Towne apartment complex and parked. Smith started to leave the front passenger seat but noticed a man standing behind the car. Although it was dark, street lights illuminated the area. At first, Smith mistook the man for a friend named Steven, but Birmingham, who was driving, responded that the man was not Steven. The man pointed a gun at Smith and Birmingham and shouted, "We got some GD's over here.[1]" Smith looked directly at the man from a distance of approximately seven feet and shouted to Birmingham to drive them away. As Smith got back in the car, Birmingham struggled with the gear shift and then caught the car on a curb. During those critical moments, the man came around to Birmingham's side of the car and began firing the

---

[1] "GD's" is an abbreviation for Gangster Disciples, a street gang in Chicago. Smith testified that Birmingham was a member of the Gangster Disciples but that she was not a member of the gang.

gun into the car. Smith dropped to the floor as she heard the bullets shatter the window but was able to see Bolton's face as she looked up. Birmingham drove toward the exit of the complex on Cottage Grove Avenue, but he had been fatally wounded. As he lost consciousness, the car swerved, hit a trash can and then rolled to a stop.

Hattie May Singleton, who lived near the apartment complex, saw the trouble developing. Hearing a commotion outside her home on 101st Street, she went to her porch and observed three men standing on a hill near an old, dark-colored car, speaking loudly. One of the men was wearing a dark jacket with white markings.[2] When another car drove past them, she heard one of the men say, "There go that n----- now." The three men walked towards the second car as it parked, and Singleton ran into her home to call the police. She heard gun shots and returned to the front porch. The old, dark-colored car was gone, and the second car was rolling slowly towards Cottage Grove Avenue.

Officers Danon Bright and Galena Bradley responded to a radio report of gunfire near 101st Street and Cottage Grove Avenue, and they arrived in time to see the victim's car hit a trash can and roll to a stop after hitting a curb. They found Birmingham unconscious, with a gun shot wound to his left side. Officer Bright saw a number of bullet holes in the car and the driver's side window was shattered. Smith was inside the car, crying hysterically. She told the officers that several

---

[2]  Smith testified that, on the night of the shooting, Bolton was wearing "some dark color with white on it."  R. 89-2, Trial Tr. at B-78.

African-American men approached the car, accused the occupants of being Gangster Disciples and then shot at them.

Several other police officers rushed to the scene as the events unfolded. Officers Ronald Holt and Milan Stanford actually heard the shots being fired. They too saw the victim's car emerge from the London Towne complex onto Cottage Grove Avenue. They saw four African-American men running in the complex. One man was wearing a distinctive sleeveless jacket, red on one side and a dark color on the other side.[3] Officer Holt sent a radio message reporting that he had seen four men running and that one was wearing a sleeveless jacket.

Officers Baron and Gibbons heard that call and drove toward the London Towne complex. As they drove into the complex, a gray car was driving out. The driver was wearing a sleeveless jacket. As the officers turned around to stop the car, they saw a passenger exit from the back seat and run away. The officers arrested the other occupants of the car, including Anthony Bolton (the petitioner here), Raymond Clark (who was wearing the sleeveless jacket), and Marcus Flowers. Officer Holt, who had seen the man in the sleeveless jacket running moments earlier, proceeded to the scene of the arrest and identified Clark as the man he had seen running with three other men.

In the meantime, Officers Alexander Curd and Shirley Tate responded to a radio call regarding the man who fled from the back seat of the gray car. As they canvassed the London Towne

---

[3] Marcus Flowers, one of the four men later arrested, testified that Clark was wearing a grey, red and blue Fila jacket. Trial Tr. at B-208-09.

complex, a woman approached them and told them that a man was hiding in some bushes nearby. As she spoke to the officers, she noticed the man was now walking towards them on the sidewalk. The officers detained the man, Shaparral Watts, and discovered a gun in the bushes where he had been hiding.[4]

Approximately two hours later, Detectives Bernatek and Cross conducted a lineup of the four suspects who had been arrested. Each man was asked to pose with his right arm extended in a shooting position. From this lineup, Smith identified Bolton as the shooter. Photographs were taken of the lineup, but could not be developed for reasons that do not appear in the record. Smith also independently identified Bolton as the shooter at his trial.

Bolton was prosecuted for the murder, as were Clark and Watts, who were tried separately before the same judge. We have already recounted the findings of the state courts from the testimony of Smith, Singleton, and many of the police officers who responded to the scene and investigated the murder. Flowers, who was not prosecuted, also testified against Bolton at trial. According to Flowers, Clark was a member of the Vice Lords street gang, Flowers and Watts were Black Disciples and Bolton was unaffiliated with any gang. On the day of the murder, Flowers accompanied Clark, Watts and

---

[4] Police officers recovered two guns that night: a .22 semi-automatic pistol from bushes near 836 E. 101st Street, and a .380 semi-automatic pistol from bushes near 725 E. 101st Street. Ballistics tests later showed that neither gun was the murder weapon. The gun used to kill Birmingham was not recovered.

a man named Jo-Jo[5] to the home of Clark's mother in the
London Towne complex. When Clark went into his mother's
home, Flowers and the others remained in the car. While they
waited for Clark, three or four men approached the car and
threatened that the occupants would be harmed if they were
not Vice Lords. Someone in the car (Flowers could not recall
who) told the men that Clark was a Vice Lord and the men
then left. When Clark returned to the car, Flowers, Watts and
Jo-Jo told Clark what had happened. Clark drove them all to
Altgeld Gardens. He went into a building with Jo-Jo and came
back with Bolton. Clark and Bolton got into the car and Clark
handed a gun to Watts. The four then drove to the London
Towne complex in search of the men who had made the threat.

At trial, Flowers initially testified that he, Bolton, Clark and
Watts then drove through the London Towne complex without
incident until they were stopped by the police. But under
additional questioning at trial, Flowers admitted that he signed
a statement on the night of the murder implicating Bolton,
Clark and Watts in the murder. Flowers then testified that,
when they drove into the London Towne complex, they saw a
car with two occupants, that Clark thought one of the occu-
pants was a Vice Lord, and that Clark, Watts and Bolton then
exited the car and approached the car containing Smith and
Birmingham.[6] According to Flowers, Watts handed a gun to

---

[5] Flowers testified that "Jo-Jo" was his cousin.

[6] Flowers' account that he remained in the car is consistent with Singleton's
testimony that she saw three men standing near a car shortly before the
shooting. Although they were purportedly looking for a Vice Lord, the
(continued...)

Bolton and Bolton approached the car. As the car attempted to pull away, Bolton fired multiple shots at the car. Watts, Clark and Bolton then returned to their own car, and Bolton gave the gun back to Watts.

On cross-examination, Flowers asserted that he signed the statement on the night of the murder because he was only sixteen years old, because the police refused to call his mother, and because the officers told him he would be imprisoned for thirty years for his involvement in the murder. But he also testified that his original written account was true, and that he changed his testimony after receiving threatening letters at home. Although Flowers flip-flopped in telling the story at trial, his testimony implicating Bolton, Clark and Watts was consistent with his signed statement made on the night of the arrest, as well as with his grand jury testimony and with the testimony of the assistant state's attorney who interviewed him on the night of the murder. The trial court found Bolton guilty of first degree murder. The same court found Clark and Watts not guilty of murder but guilty of weapons possession.

## II.

On direct appeal, Bolton contended that (1) the evidence presented at trial was insufficient to support his conviction; (2) trial counsel was ineffective for failing to join a stipulation between the State and one of Bolton's co-defendants concerning an exculpatory pre-trial statement made by Flowers; and (3) his fifty year sentence was excessive. In the course of

---

[6] (...continued)
victim was a Gangster Disciple, a discrepancy not explained in the record.

arguing that the evidence was insufficient, Bolton contended that Smith's identification evidence was "weak." In addition to pointing out poor lighting conditions, Smith's obstructed line of vision from the floor of the car, and her emotional state at the time of the shooting, Bolton also contended that her lineup identification was flawed. In particular, Bolton argued that Smith could not make an identification based solely on the physical appearance of the four men but identified Bolton only after the suspects were told to turn and pose with an arm extended in a shooting position. Bolton also complained of an "even greater taint" to the lineup identification, citing to Smith's trial testimony:

> Q  Now, how many other people were out there besides—you called him Anthony Bolton. You didn't know his name was Anthony Bolton that night, did you?
>
> A  No.
>
> Q  How did you find out his name?
>
> A  When I did the line up.
>
> Q  Police told you who he was?
>
> A  After I identified him.
>
> Q  Did they tell you he is the guy that we think did the shooting?
>
> A  Yes.
>
> Q  And that was before you viewed the line up, right?
>
> A  Yes.

R. 89-2, at B-77. Bolton contended that this testimony demonstrated that the lineup procedure was improperly suggestive. Bolton acknowledged in his direct appeal that Smith also testified on redirect that the police did not tell her who to pick in the lineup but he contended that her initial testimony of "unfairly suggestive taint" rendered her identification of Bolton unreliable and a deprivation of his due process rights.[7] He cited *Stovall v. Denno*, 308 U.S. 293 (1967), in support of this due process claim. The Illinois appellate court affirmed Bolton's conviction and sentence. The court specifically found that the trial court properly resolved any inconsistencies in Smith's testimony, that Smith consistently testified to her identification of Bolton as the shooter, that Bolton cited no authority for his contention that the lineup was tainted by a directive that the participants assume a particular pose, and that there was no factual merit to the contention that the police told Smith whom to pick from the lineup. Bolton did not seek leave to appeal this judgment to the Illinois Supreme Court.

Bolton next filed a *pro se* post-conviction petition in the state court. Citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963), he asserted that the State fraudulently withheld the photographs of the lineup. He also asserted that trial counsel was ineffective for failing to move for a mistrial when the State was unable to produce the lineup photos, citing *Strickland v. Washington*,

---

[7] On redirect, the prosecution asked Smith, "Do you remember when counsel asked you about looking at the line up in the police station?" and she replied, "Yes." The prosecutor then asked, "When the police took you in to look at the line up, did they tell you who to pick out in that line up?" and Smith replied, "No." R. 89-2, Tr. at B-89.

466 U.S. 668 (1984). He submitted an affidavit from Velcin Thomas in support of his petition, arguing that it constituted newly discovered evidence that bolstered his other claims. In the affidavit, Thomas asserted that he was in custody at the police station on the night of the lineup. He said that he was being held in a room with Watts and was taken from the room to participate in a lineup related to the death of Birmingham. Thomas maintained that, as he was being brought to the lineup, he heard Detective Cross tell Detective Bernatek that Smith did not know who the shooter was, and he was going to have Smith pick out Bolton, the man wearing dark blue pants. Thomas was subsequently returned to the room where Watts was being held. In the course of making his *Strickland* and *Brady* arguments, Bolton again contended that Smith's lineup identification was weak, and that her testimony indicated that the police officers told her to select him from the lineup. In the course of his *Brady* argument, he characterized the suggestive-ness surrounding Smith's lineup identification as a violation of his due process rights but cited no law in support of this as an issue separate from the *Brady* claim.

Instead, he mainly argued that the withheld photographs would have shown that Watts did not participate in the lineup, contrary to the testimony of Detective Bernatek. In addition to impeaching Detective Bernatek with the photographs and with the Thomas affidavit, Bolton contended that Thomas's affidavit also demonstrated that Smith testified falsely at trial when she identified Bolton as the shooter and when she denied that the police officers told her to select Bolton from the lineup. As for ineffective assistance, he contended only that counsel should

have moved for a mistrial when the State was unable to produce the lineup photographs.

Bolton subsequently filed an amended post-conviction petition with the assistance of counsel. Under Illinois law, as a general rule, an amendment which is complete in itself and which makes no reference to the prior pleading supersedes that prior pleading. *People v. Cross*, 494 N.E.2d 703, 705 (Ill. App. 3d Dist. 1986). The original pleading ceases to be part of the record, being in effect abandoned and withdrawn. *Id*. In this instance, however, the amended petition does not purport to supersede the prior pleading and specifically refers back to Bolton's *pro se* petition in several instances. It is unclear whether the state courts incorporated the original *pro se* petition into the amended petition or treated it as superseded.

In the amended petition, Bolton claimed that the affidavit of Velcin Thomas presented new evidence of actual innocence (a claim under Illinois law) because it established that Smith could not positively identify Bolton on the night of the murder. In addition to impeaching the credibility of Smith, Bolton claimed that the affidavit contradicted the testimony of the officers who conducted the lineup. Citing Smith's testimony that the police identified the shooter to her before she viewed the lineup, Bolton argued that Smith's trial admission bolstered the newly discovered evidence from Thomas. Bolton also asserted a claim of prosecutorial misconduct under Illinois law based on the failure of the prosecution to produce the lineup photographs. According to the amended petition, the photographs would have shown that both Smith and Detective Bernatek were lying about the lineup procedure. In particular, Detective Bernatek testified that the lineup consisted of Bolton,

Watts, Clark and Flowers but the photos would have shown that Watts did not participate in the lineup. Bolton also asserted that the prosecution was obliged to produce the photos under *Brady*. Finally, Bolton maintained that he received ineffective assistance of trial counsel. In particular, he alleged that counsel was aware that photos were taken but not produced and yet failed to move for a mistrial on the basis of the missing evidence. He also asserted that a competent attorney would have investigated the lineup, discovered Velcin Thomas and called him as a witness.

The state trial court gave short shrift to Bolton's amended post-conviction petition. The court rejected Bolton's *Brady* claim because there was no reasonable probability that the photographs would have altered the outcome of the trial. In reaching this conclusion, the court characterized the evidence against Bolton as "overwhelming," based on the eye witness identifications made by Smith and Flowers. The court also rejected Bolton's *Strickland* challenge, concluding that he waived the claim by not raising it in his direct appeal. The court noted (incorrectly) that Bolton's claim was based entirely on the trial record, and thus could have been raised on direct appeal. The court did not expressly address Bolton's claim that the affidavit of Velcin Thomas constituted newly discovered evidence of actual innocence. In fact, the court's only reference to the Thomas affidavit was a cryptic comment regarding the missing photographs:

> These photos, according to petitioner, would reveal that Detective Bernatek committed perjury when he testified that Shaparral Watts was in the line-up and

    that the identification made by Velcin Thomas was suggestive.

R. 65-8, at 3.

Bolton filed a *pro se* appeal of this ruling, raising three arguments. He again maintained that the prosecution withheld exculpatory evidence in violation of *Brady* when it failed to produce the photos of the lineup. In the course of that argument, he repeated his earlier claims that the lineup was suggestive because the police told Smith who the shooter was before she viewed the lineup. He relied in part on the Thomas affidavit to bolster this claim. But he did not argue that the suggestive lineup procedure violated his due process rights. He next argued that counsel was ineffective in violation of *Strickland* for failing to move for a mistrial based on the State's failure to produce the photographs of the lineup. Lastly, he asserted that the affidavit of Velcin Thomas was newly discovered evidence of actual innocence. He cited no case law in support of this argument but recited the Illinois standards for an actual innocence claim based on newly discovered evidence.

The Illinois appellate court rejected each of the claims. The court first noted that there was no evidence that the allegedly withheld photographs actually existed, and that the only evidence regarding the photos was that they could not be developed. Because there was no evidence supporting the existence of the photographs, the court rejected any claim under *Brady* that the State withheld the photographs and any claim under *Strickland* that counsel was ineffective for failing to move for a mistrial based on the absence of the photographs.

The court also concluded that Bolton could not satisfy the standard for prejudice on his ineffective assistance of counsel claim. The original trial court had denied a co-defendant's motion for a mistrial based on the absence of the photographs, and the appellate court found there was no reasonable probability that a motion would have succeeded had Bolton's counsel filed one. Finally, the court concluded that Thomas's affidavit was not newly discovered evidence of actual innocence. Rather, the affidavit merely sought to impeach Smith's corroborated lineup identification, and the evidence was not of such a character that it would have changed the outcome of the trial. The court noted that both Smith and Detective Bernatek testified that Smith was not told whom to identify. Her "momentary answer" that she was told who Bolton was before the lineup was clearly negated, the court found, by her testimony both before and after that moment, where she clearly indicated that she was not told who Bolton was until after the lineup. Bolton filed a petition for leave to appeal the ruling to the Illinois Supreme Court, repeating verbatim his three claims. The Illinois Supreme Court denied the petition for leave to appeal.

## III.

That brings us to Bolton's federal *habeas corpus* petition. In his *pro se* petition, Bolton asserted that (1) the affidavit of Velcin Thomas was newly discovered evidence in support of his constitutional claims; (2) the State engaged in prosecutorial misconduct when it withheld photographic evidence of the lineup that was favorable to the defense; and (3) trial counsel was ineffective because he failed to move for a mistrial when the State failed to produce the photographs of the lineup. In his

argument regarding the State's failure to produce the photos, Bolton once again contended that the photos could have been used to impeach Smith and Detective Bernatek, and that Thomas would have testified that Detective Cross told Smith to select Bolton from the lineup, rendering the lineup "improperly suggestive." The district court denied the petition, concluding that none of Bolton's claims met the standards set by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S.C. § 2254(d)(1). Bolton appeals.

### A.

We granted a certificate of appealability to Bolton, noting that he had "made a substantial showing of the denial of a constitutional right in connection with the admission of his lineup identification." *Bolton v. Pierce*, Case No. 10-3150, Order (7th Cir. Feb. 18, 2011). Our review of the district court's decision to deny the *habeas* petition is *de novo*, and is governed by the terms of the AEDPA. *Pole v. Randolph*, 570 F.3d 922, 933-34 (7th Cir. 2009). The AEDPA provides, in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]

28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 402-403 (2000).

On appeal, Bolton contends that his due process rights were violated when the state trial court admitted identity testimony acquired when the police placed him in an unduly suggestive lineup. The Illinois courts, he contends, unreasonably applied federal law and constitutional principles when they failed to assess whether the lineup was unduly suggestive, whether there were any unusual or exigent circumstances that could justify the suggestiveness, and whether the identification was nonetheless reliable. *See* 28 U.S.C. § 2254(d)(1). For the first time in any forum, Bolton now contends that the lineup was suggestive in two distinct ways. First, as he previously claimed in the context of his *Brady* and *Strickland* claims, Detective Cross told Smith to select Bolton, rendering the lineup literally suggestive. Second, the participants were grossly dissimilar in appearance, also resulting in an unfairly suggestive lineup. He also maintains that the state courts unreasonably applied federal law in assessing the Thomas affidavit which he now contends is newly discovered evidence that supports his due process claim regarding the unduly suggestive lineup. None of these errors were harmless, Bolton asserts, and the court therefore should have granted the writ.

As should be apparent from our recitation of the procedural history of the case, this is the first time that Bolton has raised a stand-alone suggestive lineup claim, arguing that the procedure employed violated his due process rights. Prior to his appeal in this court, Bolton framed the lineup issue as a claim for prosecutorial misconduct, asserting that the State improperly withheld photographic evidence of the lineup in violation of *Brady.* Bolton also previously asserted a claim of ineffective assistance of counsel, in violation of *Strickland*,

based on his trial counsel's failure to move for a mistrial with respect to the missing lineup photographs. In the course of those arguments, he asserted that the photographic evidence would have further supported his attacks on the credibility of the two main witnesses against him, Brandy Smith and Detective Bernatek, both of whom testified that Watts was in the lineup, when, according to Bolton, he was not. Bolton also previously asserted that the affidavit of Velcin Thomas was newly discovered evidence of actual innocence that would demonstrate that Smith could not independently identify Bolton as the shooter and that Detective Cross directed her to select Bolton. Finally, he previously argued that effective counsel would have investigated the lineup, discovered Velcin Thomas and presented his testimony to the trial court.

The claim that Bolton now brings, that he was denied due process because the lineup was suggestive in two respects, is a claim he never raised in the state courts and did not raise in the district court. Because he did not raise this stand-alone suggestive lineup argument in either his *habeas* petition or in his briefing before the district court, he has waived it on appeal. *Pole*, 570 F.3d at 937 (where a petitioner does not raise an issue in either his *habeas* petition or his brief in the district court, he has waived the issue in federal proceedings). *See also Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) (claims not made in the district court in a *habeas* petition are deemed waived and cannot be raised for the first time on appeal).

**B.**

But even if we do not treat the issue as waived, Bolton failed to meet the exhaustion requirement of the AEDPA

because he did not fairly present this claim to any of the state courts that reviewed his case, much less present it through a complete round of state court review. *Pole*, 570 F.3d at 934 (under section 2254's exhaustion requirement, a petitioner must assert his federal claim through one complete round of state court review, either on direct review or in post-conviction proceedings). The AEDPA requires state prisoners seeking a federal writ of *habeas corpus* to exhaust available state remedies. 28 U.S.C. § 2254(b)(1); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). The exhaustion requirement provides the State an "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (*per curiam*) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)); *Baldwin*, 541 U.S. at 29. "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin*, 541 U.S. at 29 (quoting *Duncan*, 513 U.S. at 365-366); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Perruquet v. Briley*, 390 F.3d 505, 513 (7th Cir. 2004). Adequate presentation of a claim to the state courts requires the petitioner to present both the operative facts and the legal principles that control each claim. *Pole*, 570 F.3d at 934-35. *See also Harrison v. McBride*, 428 F.3d 652, 661 (7th Cir. 2005) (at its core, the task of the *habeas* court is to assess, in concrete, practical terms, whether the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis).

At no stage of the state proceedings did Bolton present a claim that his due process rights were violated by a suggestive

lineup procedure. Indeed, on direct appeal, Bolton failed to present *any* claim through a complete round of state court review because he failed to seek leave to appeal his case to the Illinois Supreme Court. Moreover, to the extent that he raised the suggestive identification issue in his direct appeal (which was the only pleading in which he cited a relevant federal case regarding a due process right to a fair lineup), he claimed only that a police officer told Smith to select him from the lineup, and never contended that the participants in the lineup were grossly dissimilar in appearance. In any case, because he did not move for leave to appeal to the Illinois Supreme Court in his direct appeal, he may not rely on his direct appeal to satisfy the exhaustion requirement. *Boerckel*, 526 U.S. at 848 (petitioner's failure to present his federal habeas claims for discretionary review to the Illinois Supreme Court in a timely fashion resulted in a procedural default of those claims).

In the course of post-conviction proceedings, Bolton argued in the context of his *Brady* and *Strickland* claims that the lineup was suggestive in the sense that Detective Cross literally suggested to Smith that she select Bolton from the lineup. In both his *Brady* and *Strickland* claims, he argued only that the suggestive lineup demonstrated that he was prejudiced by the absence of the photographs. But he has never argued to any court, including the district court, that the lineup procedure violated his due process rights. Instead, he argued that the State should have produced the photographs of the lineup and that his counsel was ineffective was failing to move for a mistrial when the State failed to produce the photographs, claims he has abandoned on appeal. And he did not argue in

any court that the lineup was unduly suggestive because the participants were grossly dissimilar in appearance.[8]

As for his claim regarding the affidavit of Velcin Thomas, Bolton now argues that the affidavit is newly discovered evidence that supports his due process claim regarding the suggestive lineup. But in the district court, Bolton argued that the affidavit supported his *Strickland* and *Brady* claims, both of which he has abandoned on appeal. He also previously asserted that the affidavit was newly discovered evidence of actual innocence, but he does not pursue that claim on appeal either. In no sense did he ever raise a stand-alone due process claim based on the suggestive lineup. Instead, he used evidence of the suggestive lineup to demonstrate that he was prejudiced by the *Brady* and *Strickland* violations. Having failed to present the operative facts and the relevant legal argument to support a suggestive lineup due process claim through a complete round of state court review, Bolton has failed to meet the exhaustion requirement. *Perruquet*, 390 F.3d at 513; *Pole*, 570 F.3d at 934-35.

---

[8] In fact, there is an internal inconsistency between his two suggestive lineup arguments: in claiming that the participants were of grossly dissimilar appearance, Bolton contends that Watts (some thirty pounds lighter and six inches shorter than Bolton) was one of the participants in the lineup. Yet he supports his claim that Detective Cross told Smith to select Bolton with an affidavit that asserts that Watts was not part of the lineup at all. Instead, the affidavit suggests that Thomas (whose resemblance to the other participants is not apparent from the record) was in the lineup in place of Watts. The two claims cannot be factually reconciled, but more importantly, Bolton never argued until his appeal in this court that the lineup was faulty because the participants were of dissimilar appearance.

But exhaustion is not always the end of the analysis. "Where state remedies remain available to a habeas petitioner who has not fairly presented his constitutional claim to the state courts, the exhaustion doctrine precludes a federal court from granting him relief on that claim: although a federal court now has the option of denying the claim on its merits, 28 U.S.C. § 2254(b)(2), it must otherwise dismiss his habeas petition without prejudice so that the petitioner may return to state court in order to litigate the claim." *Perruquet*, 390 F.3d at 514; *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Rose v. Lundy*, 455 U.S. 509, 522 (1982); *see* 28 U.S.C. § 2254(b)(1)(A). Where the petitioner has already pursued his state court remedies "and there is no longer any state corrective process available to him, it is not the exhaustion doctrine that stands in the path to habeas relief, *see* 28 U.S.C. § 2254(b)(1)(B)(i), but rather the separate but related doctrine of procedural default.*" Perruquet*, 390 F.3d at 514. *See also Coleman v. Hardy*, 628 F.3d 314, 318 (7th Cir. 2010) (when a petitioner fails to raise a particular claim on direct appeal or in post-conviction proceedings, the claim is procedurally defaulted). Procedural default generally precludes a federal court from reaching the merits of a *habeas* claim when the claim was not presented to the state courts and it is clear that the state courts would now find the claim procedurally barred. *Perruquet*, 390 F.3d at 514.

Procedural default may be excused, however, if the petitioner can show both cause for and prejudice from the default, or can demonstrate that the district court's failure to consider the claim would result in a fundamental miscarriage of justice. *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (a federal court will not entertain a procedurally defaulted constitutional

claim in a petition for *habeas corpus* absent a showing of cause and prejudice to excuse the default); *Coleman*, 628 F.3d at 318 (procedural default may be avoided if a petitioner can demonstrate cause and prejudice, or a fundamental miscarriage of justice); *Gray v. Hardy*, 598 F.3d 324, 327-28 (7th Cir. 2010) (same); *Perruquet*, 390 F.3d at 514-15 (same). Bolton fails to meet these standards. Although he claims that the Thomas affidavit is newly discovered evidence that was unavailable to him at trial, Bolton himself participated in the lineup and knew at the time of trial whether or not Watts was part of the lineup and whether the participants were grossly dissimilar in appearance. Smith's ambiguous testimony regarding whether a police officer directed her to select Bolton was also known at the time of trial, and thus was not a new issue. Although it is true that Thomas would have been an additional witness who could have bolstered this claim, Bolton abandoned his claim that counsel was ineffective for failing to investigate the lineup and discover Thomas as a potential witness. Thus, although ineffective assistance of counsel may have supplied the "cause" in the "cause and prejudice" analysis, Bolton dropped his claim of ineffective assistance, dooming his claim on appeal. *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012) ("an attorney's errors during an appeal on direct review may provide cause to excuse a procedural default; for if the attorney appointed by the State to pursue the direct appeal is ineffective, the prisoner has been denied fair process and the opportunity to comply with the State's procedures and obtain an adjudication on the merits of his claims."); *Promotor v. Pollard*, 628 F.3d 878, 887 (7th Cir. 2010) (ineffective assistance of counsel can constitute cause to set aside a procedural bar, but

not where a petitioner defaulted his ineffective assistance of counsel claim and he does not offer cause-and-prejudice to excuse this default).

Nor can he demonstrate a fundamental miscarriage of justice. In order to meet that standard, he must convince the court that no reasonable trier of fact would have found him guilty but for the error allegedly committed by the state court. *Schlup v. Delo*, 513 U.S. 298, 327-29 (1995); *Perruquet*, 390 F.3d at 515. His further challenges to Smith's lineup identification do not meet that standard. The Thomas affidavit is untested and does nothing to overcome the testimony of Smith, Flowers, and the numerous officers on the scene. Bolton does not even attempt to challenge Smith's independent in-court identification of him as the shooter. There is nothing here that would convince a court that no reasonable trier of fact would have found Bolton guilty but for an error allegedly committed by the state court. *Schlup*, 513 U.S. at 327-29. That is not to say that this lineup procedure was without flaws. As best we can tell from the largely undeveloped record on this issue, the participants in the lineup were not of similar appearance, which, in general, is an unnecessarily suggestive procedure that creates a substantial risk of unfair prejudice to a suspect. *United States v. Wade*, 388 U.S. 218, 232-33 (1967) (listing a variety of improperly suggestive lineup procedures including, among other things, that all in the lineup but the suspect were known to the identifying witness, that the other participants in a lineup were grossly dissimilar in appearance to the suspect, that only the suspect was required to wear distinctive clothing which the culprit allegedly wore, that the witness is told by the police that they have caught the culprit after which the defendant is

brought before the witness alone or is viewed in jail, or that the suspect is pointed out before or during a lineup). But Bolton was identified as the shooter by Flowers as well as by Smith, and there is simply not enough here to overcome Bolton's procedural failures in preserving the issue for federal *habeas* review.

## C.

Finally, Bolton also contends that, because our certificate of appealability invited him to address the denial of his constitutional rights in connection with the admission of his lineup identification, he may raise any violation of his constitutional rights related to the lineup. But Bolton misunderstands the import of the certificate of appealability. Prisoners pursuing a collateral attack on their criminal conviction under § 2254 are required to obtain a certificate of appealability before proceeding on appeal. 28 U.S.C. § 2253(c); *Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011). "To receive certification under § 2253(c), the prisoner must show that reasonable jurists would find the district court's assessment of the constitutional claim and any antecedent procedural rulings debatable or wrong." *Lavin*, 641 F.3d at 832 (citing *Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000); *Davis v. Borgen*, 349 F.3d 1027, 1029 (7th Cir. 2003)). When a petitioner's case is subject to § 2253(c), non-certified claims are not properly before this court. *Lavin*, 641 F.3d at 832. A lawyer who wishes to raise claims that are not within the scope of the certificate of appealability "should not simply brief the additional claims, but should first request permission to do so." *Lavin*, 641 F.3d at 832. Counsel made no such request here. In this case, we certified the issue of a possible denial of Bolton's constitutional rights in connection

with the admission of his lineup identification, an issue which had been raised in the context of *Brady* and *Strickland*. Any other issues were beyond the scope of the certificate. More importantly, Bolton does not explain how a certificate of appealability could resurrect procedurally defaulted claims or allow a petitioner to make claims in the first instance when the petitioner has not met the exhaustion standards set by the AEDPA.

## IV.

Bolton waived the issue he now raises by not raising it in his petition for *habeas corpus* relief and by not arguing it before the district court. He also failed to fairly present the issue through a complete round of state court review, and the claim is procedurally defaulted. We can discern no factual or legal argument that would excuse any of these procedural failures. The judgment of the district court denying the petition is therefore

AFFIRMED.