In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3844

TOMMY D. FORD,

*Petitioner-Appellant,*

*v.*

BILL WILSON, Superintendent

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:11-cv-490-JTM — **James T. Moody**, *Judge.*

ARGUED APRIL 17, 2014 — DECIDED MAY 2, 2014

Before MANION, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge*. This is a habeas action brought under 28 U.S.C. § 2254, in which Petitioner Tommy Ford challenges his conviction for murder in an Indiana state court. On appeal, Ford maintains only one ground for relief: that his trial counsel was ineffective in failing to object when the state prosecutor commented on his failure to testify. Ford contends that an objection would have been sustained because the prosecutor's comments violated his Fifth Amend-

ment privilege against compulsory self-incrimination. How-ever, even assuming that to be true, Ford has failed to show prejudice resulting from his attorney's failure to object. Therefore, we affirm.

## I.  BACKGROUND

In § 2254 proceedings, factual determinations made by the state court are presumed to be correct. 28 U.S.C. § 2254(e)(1). Ford has made no attempt to rebut this pre-sumption as it pertains to the facts relied upon by the Indi-ana Court of Appeals, which summarized the evidence at trial as follows:

> On November 1, 2005, Ford visited Glen Park in Gary and encountered an acquaintance, James Grace. Ford talked with Grace and drank vodka with one of Grace's friends. Grace told Ford that he needed a place to store his vehicle. Ford offered to show Grace his garage as a possible storage location. Ford left his car at the park and rode with Grace to Ford's home. As the two men approached Ford's house, they passed fifteen-year-old Christian Hodge, who was seated on a front-yard retaining wall on the property next door. Ford and Hodge greeted each other. When Ford and Grace entered Ford's house, Ford said to Grace, "I can't stand that mother fucker. I'll be back." Ford left the house, and Grace heard a popping sound shortly thereafter. He looked outside and saw Hodge lying in the street. Ford came back inside the house and said to Grace, "I got to get the fuck out of here, and meet me down—meet me at the end of the alley and pick me up." Grace got into his truck and drove away. He soon located a police officer and led him

back to the crime scene. Hodge had suffered one gun-shot wound to the back of his head, and he died the next day.

At the crime scene, Gary Police Officer Daniel Quasney spoke with witness Ronell Simmons, who appeared to be "upset, in disbelief, and in a state of shock." Simmons stated that he had seen the victim talking to a black male in a black hooded sweatshirt. He stated that the man pulled out a gun and shot Hodge in the head and then walked away.

Ford's first trial, in which Simmons testified, ended in a mistrial on May 18, 2006. During the second trial, the State alleged that Simmons was unavailable to testify and moved for admission of Simmons's prior testimony. The trial court denied the State's request. The State later moved to admit Officer Quasney's testimony recounting Simmons's statements at the crime scene. The trial court admitted this evidence pursuant to Indiana Evidence Rule 803(2), the excited utterance exception to the hearsay exclusion rule.

*Ford v. State* (*Ford I*), No. 45A03–0701–CR–20, 2007 WL 3071987, at *1 (Ind. Ct. App. Oct. 23, 2007) (citations omitted).

During closing arguments in Ford's second trial, his attorney argued that the state had failed to provide any reasonable explanation as to why Ford would shoot Hodge. In response, the state prosecutor argued as follows:

Sometimes we'll never know why crimes were committed. Someone who could—now, let me phrase this correctly, he never has to say a single word, a single

word. It's the State's burden to prove that he commit-ted this crime beyond a reasonable doubt, but what happens when you have crimes, when you have one or two people there who can possibly talk and tell you what happened and one of them's dead? One of them's dead. Who else are we going to get that infor-mation from? The next possible source is the person who committed the offense. If that person who com-mitted the offense don't talk, how would we ever know? We would speculate. Does it mean the person wasn't shot and killed, it didn't happen?

It happened, and that's what we have to prove to you, not why it happened.

*Ford v. State* (*Ford II*), No. 45A05–1009–PC–610, 2011 WL 3476616, at *9 (Ind. Ct. App. Aug. 9, 2011). Ford was convict-ed and sentenced to fifty years' imprisonment.

Following his conviction, Ford filed an unsuccessful di-rect appeal. Later, he filed a petition for postconviction relief in Lake County Superior Court, presenting several grounds for relief, including the one we address today. However, the Superior Court denied Ford's petition, the Indiana Court of Appeals affirmed, and the Indiana Supreme Court denied his petition to transfer.

Having exhausted his state remedies, Ford filed this § 2254 petition in the U.S. District Court for the Northern District of Indiana. However, the district court dismissed his petition and denied him a certificate of appealability. Ford then filed a notice of appeal in this court, and we granted him a certificate of appealability.

## II.   TIMELINESS

Ford's notice of appeal was filed on December 4, 2012, thirty-two days after the district court's judgment. Thus, in its response brief, the state argued that the appeal should be dismissed as untimely. *See* Fed. R. App. P. 4(a)(1). However, Ford is an inmate confined in an institution; therefore, he may benefit from the so-called "prisoner mailbox rule," under which a notice is timely "if it is deposited in the institution's internal mail system on or before the last day for filing." Fed. R. App. P. 4(c)(1). "If an institution has a system designed for legal mail, the inmate must use that system to receive the benefit of this rule." *Id.* "If the prison lacks such a system: 'Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 … which must set forth the date of deposit and state that first-class postage has been prepaid.'" *United States v. Craig*, 368 F.3d 738, 740 (7th Cir. 2004) (quoting Fed. R. App. P. 4(c)(1)).

After the state's response brief was filed in our court, Ford filed such a declaration, stating that he placed his notice of appeal in the prison's internal mailing system on November 28, 2012, twenty-six days after the district court's judgment, "with first class postage affixed." Ford was not required to file this declaration simultaneously with his notice of appeal. *See Ingram v. Jones*, 507 F.3d 640, 642–44 (7th Cir. 2007) (relying on declarations filed after the notice of appeal to establish compliance with Rule 4(c)(1)); *Grady v. United States*, 269 F.3d 913, 917–18 (8th Cir. 2001) (holding that the declaration required by Rule 4(c)(1) need not accompany the notice of appeal). Moreover, he was required to "attest to 'only two things': the date the notice was deposited into the prison mail system and that first class postage was

prepaid."[1] *Hurlow v. United States*, 726 F.3d 958, 964 (7th Cir. 2013) (quoting *Craig*, 368 F.3d at 740). Ford's declaration satisfies these requirements, and it is corroborated by the certificate of service he included with his notice of appeal, which states that he served a copy on the Indiana Attorney General on November 28, 2012, "by depositing the same in the United States Mail, postage paid." As a result, we find his notice timely, and we turn to the merits of his appeal.

## III.  DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a state prisoner may obtain federal habeas relief based on a claim of legal error only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In this case, the district court determined that Ford was not entitled to relief under that standard.

"Our review of the district court's decision to deny the *habeas* petition is *de novo*, and is governed by the terms of the AEDPA." *Bolton v. Akpore*, 730 F.3d 685, 693 (7th Cir. 2013). "Thus, although we technically hear this appeal from the district court, our inquiry focuses entirely on what occurred in the state court. In so doing, we look at 'the decision of the last state court to rule on the merits of the petitioner's claim.'" *McNary v. Lemke*, 708 F.3d 905, 913 (7th Cir. 2013) (quoting *McCarthy v. Pollard*, 656 F.3d 478, 483 (7th Cir. 2011)). In this case, that was the Indiana Court of Appeals,

---

[1] The state does not contend that the institution where Ford is confined has a separate mailing system designed for legal mail that Ford should have used.

when it affirmed the denial of Ford's petition for postconviction relief. *Ford II*, 2011 WL 3476616.

### A. CONSTITUTIONAL FRAMEWORK

In order to determine whether the Indiana Court of Appeals issued a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," it is first necessary to understand what that law is. Thus, before turning to the state court's decision, we consider what the Supreme Court has said about the constitutionality of prosecutorial comments on a defendant's silence.

### 1. *Griffin v. California* and the Fifth Amendment Privilege

In *Griffin v. California*, 380 U.S. 609 (1965), a state prosecutor commented on a murder defendant's failure to testify,[2] and the trial court instructed the jury that it was permitted to draw an adverse inference based on the defendant's failure to explain or deny facts within his knowledge.[3] At the time, a California constitutional provision allowed both the prosecutor and the court to comment on the defendant's silence.

_____

[2] After asserting that the defendant was in a position to know what happened, the prosecutor said, "Essie Mae is dead, she can't tell you her side of the story. The defendant won't." 380 U.S. at 611 (internal quotation marks omitted).

[3] The trial court instructed, "As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable." 380 U.S. at 610 (internal quotation marks omitted).

However, the Supreme Court held that the Fifth Amendment privilege against compulsory self-incrimination, which applies to the states through the Fourteenth Amendment, "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 615. In doing so, the Court reasoned that "comment on the refusal to testify is a remnant of the inquisitorial system of criminal justice, which the Fifth Amendment outlaws." *Id.* at 614 (citation and internal quotation marks omitted). The Court denounced the practice of commenting on a defendant's silence as "a penalty imposed by courts for exercising a constitutional privilege," noting that it "cuts down on the privilege by making its assertion costly." *Id.*

Over twenty years later, the Court revisited the Fifth Amendment privilege in *United States v. Robinson*, 485 U.S. 25 (1988). In that case, the defendant did not testify, but in closing arguments his attorney suggested that the government had unfairly deprived him of the opportunity to tell his side of the story. In response, the prosecutor argued that the defendant had several opportunities to explain his actions, including the opportunity to testify at trial. On appeal, the defendant argued that the prosecutor's comments violated his Fifth Amendment privilege against compulsory self-incrimination as interpreted in *Griffin*. However, the Supreme Court disagreed.

The Court rejected the view that "any 'direct' reference by the prosecutor to the failure of the defendant to testify violates the Fifth Amendment as construed in *Griffin*." *Id.* at 31. Instead, "*Griffin* prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's si-

lence as substantive evidence of guilt." *Id.* at 32 (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976)). Thus, the Court reasoned:

> Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated. But where as in this case the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege.

*Id.* The Court recognized that the defendant's assertion of the privilege may be costly in either situation, but it emphasized that in order to serve the truth-finding purpose of a criminal trial, "it is important that both the defendant and the prosecutor have the opportunity to meet fairly the evidence and arguments of one another." *Id.* at 33.

### 2. *Doyle v. Ohio* **and the Right to Due Process**

Eleven years after *Griffin*, the Supreme Court decided *Doyle v. Ohio*, 426 U.S. 610 (1976). In that case, two defendants were charged with selling marijuana to an informant. In their separate trials, each defendant took the stand and for the first time asserted that he was trying to buy, rather than sell, marijuana. To impeach them, the prosecutor brought out on their respective cross-examinations that neither defendant told that story to the police after he was arrested. The prosecutor also relied on the defendants' post-arrest silence in his closing arguments.

In considering the constitutionality of this practice, the Supreme Court first noted that the defendants had been giv-

en *Miranda* warnings when they were arrested and that those warnings implicitly assured them that their silence would carry no penalty. *Id.* at 618. The Court then concluded that "[i]n such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.*

Later, in *Wainwright v. Greenfield*, 474 U.S. 284 (1986), the Court found that the due process concerns recognized in *Doyle* were equally relevant when a defendant's post-arrest silence was used to respond to a defense theory, rather than to impeach the defendant. In *Wainwright*, the defendant presented an insanity defense, and the prosecution attempted to rebut that defense by showing that the defendant was of sound enough mind to exercise his right to remain silent after receiving *Miranda* warnings. The Court held that this violated the defendant's right to due process as interpreted in *Doyle*. *Id.* at 295.

These cases reflect an important difference between the violation of due process recognized in *Doyle* and the violation of the Fifth Amendment privilege recognized in *Griffin*. Specifically, as the Court held in *Robinson*, prosecutors may use a defendant's silence to impeach him or to fairly respond to a defense theory without violating the Fifth Amendment privilege. However, due process generally prohibits prosecutors from using the fact that a defendant remained silent after receiving *Miranda* warnings, even if that fact is used for purposes of impeachment (as in *Doyle*) or in response to a defense theory (as in *Wainwright*).

Indeed, the Court has declined to find a violation of due process based on the mention of a defendant's silence after

receiving *Miranda* warnings only where that silence "was not used against him within the meaning of *Doyle*." *Greer v. Miller*, 483 U.S. 756, 764 n.5 (1987). Just as in *Doyle*, the defendant in *Greer* took the stand and presented an exculpatory story, and the prosecutor asked him why he had not told that story when he was arrested. However, in *Greer*, defense counsel immediately objected, and the court sustained the objection and later advised the jury that it should disregard any questions to which an objection was sustained. Moreover, the prosecutor asked no further questions on the subject, nor did he refer to the defendant's silence in his closing argument. The Court held that no due process violation occurred because the defendant's post-arrest silence "was not submitted to the jury as evidence from which it was allowed to draw any permissible inference." *Id.* at 764–65.

## B.  THE STATE COURT'S POSTCONVICTION DECISION

In this case, Ford claims that his trial counsel was ineffective in failing to object to the prosecutor's comments on his failure to testify. In his brief to the Indiana Court of Appeals, he argued that such an objection inevitably would have been sustained because the prosecutor's comments violated his Fifth Amendment privilege against compulsory self-incrimination. He cited *Griffin* in support of this argument, and he did not rely on *Doyle* or other cases dealing with *Doyle*-type due process violations.

Even so, the Indiana Court of Appeals analyzed Ford's claim under *Doyle*. The court recognized that in *Doyle*, "the United States Supreme Court held that, under the Fourteenth Amendment, a prosecutor may not use the silence of a defendant who has been arrested and Mirandized to impeach the defendant." *Ford II*, 2011 WL 3476616, at *7. How-

ever, the court also noted that in both *Doyle* and *Wainwright*, "the prosecution used the act of the defendant's silence or the fact of the request for counsel itself as indicative of guilt or damaging to credibility." 2011 WL 3476616, at *8 (quoting *Willsey v. State*, 698 N.E.2d 784, 793 (Ind. 1998)) (internal quotation marks omitted). Based on this principle, the court held that "the State did not run afoul of *Doyle* when it referred to Ford's silence in direct response to a defense theory and when that use was not used to indicate the defendant's guilt or damage his credibility." *Id.*

This was wrong in two respects. First, Ford's claim was based on his Fifth Amendment privilege, not his right to due process. Thus, the Indiana Court of Appeals applied the wrong legal standard. The state argues that Ford's claim could be governed by either *Doyle* or *Griffin*, given that the prosecutor's comments were vague and could have referred to Ford's silence immediately after his arrest or at trial. But the fact remains that Ford has not relied on the due process rights articulated in *Doyle*. And even if he had advanced such a claim, the Indiana Court of Appeals should have considered his *Griffin* argument as well. Due process and the Fifth Amendment privilege are independent rights, and one may be violated even though the other is not.

Second, even if Ford's claim was based on due process, the court's application of *Doyle* was incorrect. As *Wainwright* makes clear, due process may be violated even if the defendant's post-arrest silence is used "in direct response to a defense theory."[4] Moreover, it is inaccurate to say that Ford's

---

[4] The Indiana Court of Appeals cited *Willsey v. State*, 698 N.E.2d 784 (Ind. 1998), in support of its holding. *Willsey*, quoting one of our cases, recognized that "*Doyle* does not impose a prima facie bar against any

silence "was not used to indicate [his] guilt or damage his credibility." It was used to explain the state's inability to prove motive, and while motive was not an element of the offense, it was certainly relevant. *See Turner v. State*, 953 N.E.2d 1039, 1057 (Ind. 2011) ("Evidence of a defendant's motive is always relevant in the proof of a crime."); *see also House v. Bell*, 547 U.S. 518, 540 (2006) ("When identity is in question, motive is key."). Because evidence of motive would have been probative of Ford's guilt, the prosecutor's explanation for the absence of such evidence was necessarily used to indicate Ford's guilt, or at least to rebut a suggestion of innocence, which is simply the reverse side of the same coin.

Of course, the fact that the Indiana Court of Appeals misapplied *Doyle* does not in itself permit relief under the AEDPA, because "the court's application must have been more than incorrect; it must have been objectively unreasonable." *Ruhl v. Hardy*, 743 F.3d 1083, 1091 (7th Cir. 2014). However, the court never should have applied *Doyle* in the

---

mention whatsoever of a defendant's right to request counsel, but instead guards against the exploitation of that constitutional right by the prosecutor." 698 N.E.2d at 793 (quoting *Lindgren v. Lane*, 925 F.2d 198, 202 (7th Cir. 1991)) (internal quotation mark omitted). However, this does not mean that a defendant's post-arrest silence or request for counsel may be used in response to a defense theory. It is simply another way of stating the unremarkable proposition that there is no due process violation if the defendant's post-arrest silence or request for counsel "was not used against him within the meaning of *Doyle*." *Greer*, 483 U.S. at 764 n.5; *see Willsey*, 698 N.E.2d at 793 ("[T]he State took advantage of Willsey's implication of sinister knowledge, not the request for counsel."); *Lindgren*, 925 F.2d at 202 ("Since this request for counsel was not used against petitioner, [*Wainwright*] was not contravened.").

first place, and a "state court's decision is 'contrary to' federal law if it employs the wrong legal standard established by the Supreme Court." *McNary*, 708 F.3d at 913 (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). Therefore, apart from the state court's misapplication of *Doyle*, Ford has cleared the AEDPA hurdle.

But this is not the end of our inquiry. "Where the state court's decision is 'contrary to' federal law, that decision is not entitled to the usual AEDPA deference and is therefore reviewed *de novo* with the reviewing court applying the correct legal standard." *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012). Thus, we must apply the correct legal standard to Ford's claim, without deference to the state court's decision, to determine whether his attorney's failure to object warrants reversal of his conviction.

## C. *DE NOVO* REVIEW

Under *Griffin*, we must ask whether the prosecutor's comments were a fair response to defense counsel's argument that the state failed to prove motive. We have our doubts. As Ford points out, the prosecutor could have stopped at saying that the state was not required to prove motive. He also could have pointed out that there was evidence of motive in the record, given that Ford told Grace just before the shooting, "I can't stand that mother fucker."

However, we must back up a moment. Ford's claim is not based on the Fifth Amendment directly but rather on the ineffectiveness of his counsel in failing to recognize and object to a Fifth Amendment violation. Indeed, a Fifth Amendment violation would not in itself be a proper basis for habeas relief, because Ford did not present such a claim

to the Indiana courts. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (To sufficiently exhaust state remedies, a federal habeas petitioner must "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").

The general rule in Indiana is that "[i]f an issue was known and available on direct appeal, but not raised, it is procedurally defaulted as a basis for relief in subsequent proceedings." *Williams v. State*, 808 N.E.2d 652, 659 (Ind. 2004). The only exception is a claim of ineffective assistance of trial counsel, which is properly presented in a post-conviction proceeding if not raised on direct appeal. *Id.* Ford failed to raise a Fifth Amendment challenge on direct appeal, so he was procedurally barred from doing so in his state postconviction proceedings, except in the context of a claim of ineffective assistance of counsel. We will not circumvent the state's procedural rules by considering Ford's Fifth Amendment challenge directly.

"Under *Strickland v. Washington*'s familiar, two-pronged test for ineffective assistance of counsel, [Ford] must demonstrate that (1) his counsel's performance was deficient; and, (2) that deficiency resulted in prejudice." *United States v. Berg*, 714 F.3d 490, 496–97 (7th Cir. 2013). Thus, even assuming the prosecutor's comments violated Ford's Fifth Amendment privilege (which we do not decide), and further assuming that defense counsel's failure to object fell below an objective standard of reasonableness (which we also do not decide), Ford must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, at 694 (1984). This he cannot do.

Ford argues that he was prejudiced because his first trial resulted in a hung jury, and the prosecutor's comments on his silence were the only significant difference between the two trials. However, there was at least one other significant difference: one of the state's witnesses, Sade Robinson, testified at the first trial but was unavailable for the second, and in the latter trial, the court allowed her prior testimony to be read to the jury. Ford's counsel did not object because he believed that his cross-examination in the first trial had been effective and that Robinson would be more prepared if she were called to testify again. Indeed, during Ford's postconviction hearing, his trial counsel testified that when the state agreed to have Robinson's prior testimony read to the jury, "I did back flips because I felt her testimony in the first trial had been extremely helpful to Mr. Ford and played a role in the verdict." Apparently, his cross-examination did not have the same impact when it was read to the jury in the second trial. This simply underscores the need to be cautious "in assigning critical significance to the failure of a different jury, which heard different evidence and argument, to reach agreement." *United States v. Williams*, 212 F.3d 1305, 1311 n.10 (D.C. Cir. 2000).

Moreover, "[a] jury may hang for any number of reasons, including the idiosyncratic views of a single juror." *United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004). As a result, only in close cases should the fact of a prior hung jury lead to a finding of prejudice. *Id.* This is not such a case because the evidence against Ford was far too strong for us to find prejudice under *Strickland*.

James Grace testified that after he and Ford walked past Hodge and into Ford's house, Ford said, "I can't stand that mother fucker. I'll be back." Ford left the house, and shortly thereafter Grace heard a popping sound. He looked out the front window of Ford's house and saw Hodge lying in the street. As Grace continued to look out the window, Ford reappeared behind him and frantically said, "I got to get the fuck out of here, and meet me down—meet me at the end of the alley and pick me up."

Gary Police Officer Daniel Quasney testified that after he arrived at the scene, he questioned a witness named Ronell Simmons. Simmons stated that he had seen Hodge talking to a black male in a black hooded sweatshirt and that the man had pulled out a gun, shot Hodge in the head, and walked away.

Veveca Story, Sade Robinson's sister, testified that on the day of the shooting, one of her coworkers drove her and Robinson to their mother's house, which was next door to Ford's. As soon as they pulled up to the house, there was a popping sound. When Story turned to look behind her, she saw Ford walking toward his house with a gun in his hand. Ford was wearing dark clothing, and as he walked, he made a slashing motion across his throat. Ford and Story's mother had been neighbors for about two years at the time, and Story had seen Ford many times before. As a result, she was able to recognize him at the time, and she later identified him at trial.

In addition to the testimony of these witnesses, Ford's cellmate testified that Ford confessed to shooting Hodge. Taken together, the strength of this evidence negates any reasonable probability that the outcome of Ford's trial would

have been different absent the prosecutor's comments. *See, e.g., Morales v. Johnson*, 659 F.3d 588, 602 (7th Cir. 2011) ("The two eyewitness identifications were substantial evidence against [the defendant] and negated any possibility of *Strickland* prejudice from [his attorney's] errors … ."). Consequently, Ford is not entitled to habeas relief based on the claimed ineffective assistance of his trial counsel.[5]

## IV.    CONCLUSION

Although the Indiana Court of Appeals applied the wrong legal standard to Ford's claim, when we apply the correct standard, we get the same result. Even assuming the performance of Ford's trial counsel was deficient, there is no reasonable probability that adequate performance would have changed the outcome of Ford's trial. Therefore, the district court's dismissal of Ford's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is AFFIRMED.

---

[5] The outcome would be the same if we were to consider Ford's claim directly under the Fifth Amendment and conduct a harmless-error analysis. Ford asks us to apply the *Chapman* harmless-error standard, under which "the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). But that only applies on direct appeal; the "the *Kotteakos* harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). "The test under *Kotteakos* is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In other words, there must be "actual prejudice." *Id.* (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). This is difficult to distinguish from the *Strickland* standard, but it may be somewhat more defendant-friendly. *See United States v. Dominguez Benitez*, 542 U.S. 74, 86–87 (2004) (Scalia, J., concurring in the judgment). Even so, we would reach the same result under either standard in this case.