FILED

Dec 21 2020, 9:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Meggan E. Smith
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan M. Comer
Andrew A. Kobe
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Anthony T. Williams,<br>*Appellant-Petitioner,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Respondent.* | December 21, 2020<br><br>Court of Appeals Case No.<br>20A-PC-998<br><br>Appeal from the Lake Superior<br>Court<br><br>The Honorable Salvador Vasquez,<br>Judge<br><br>The Honorable Kathleen Sullivan,<br>Magistrate<br><br>Trial Court Cause No.<br>45G01-1807-PC-10 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Petitioner, Anthony Williams (Williams), appeals the post-conviction court's denial of his petition for post-conviction relief.

We affirm.

# ISSUES

Williams presents this court with two issues, which we restate as:

> (1) Whether he was denied the effective assistance of Trial Counsel due to her cross-examination of a witness that opened the door to inculpatory evidence; and

> (2) Whether he was denied the effective assistance of Appellate Counsel who chose not to challenge the trial court's admission of the inculpatory evidence.

# FACTS AND PROCEDURAL HISTORY

In the fall of 2013, Aja Jester (Jester) spent time with her friend Damian Reedus (Reedus), whom she would occasionally lend her white passenger van. Reedus was almost always accompanied by his friend Williams. Acquaintances of Reedus and Williams described the closeness of their friendship as being like brothers. On December 1, 2013, Jester agreed to lend Reedus her van. Jester, Reedus, and Williams spent time together on December 1, 2013, after which Reedus and Williams dropped Jester off at her home in Gary, Indiana. Reedus had promised to return the van to Jester by 5:00 p.m. that day, but he and Williams did not arrive at Jester's home until the early morning hours of

December 2, 2013. Jester drove Reedus and Williams back to Reedus' house, stopping for gas along the way. Reedus was seated in the front passenger seat, and Williams was seated in a captain's chair directly behind Jester. After they reached Reedus' home, Williams stated that he had changed his mind and wished to be driven to his own home.

[5] Shortly after Jester pulled away to drive the short distance to Williams' home, she heard two gunshots as Williams shot Reedus twice in the head, killing him. She turned and asked Reedus what she had heard. Receiving no response, Jester turned to look at Williams. Williams then shot Jester in the neck. Jester was gravely wounded but did not die. Jester managed to put the van in park. Other facts pertaining to Williams' offenses as found by this court on direct appeal are as follows:

> Williams then pulled Jester out of the van, straddled her, pointed the gun at her face, and told her she had to die because she had seen his face. Although Williams pulled the trigger twice, the gun failed to fire. Jester then managed to run away, and Williams drove away in the van.

*Williams v. State*, 86 N.E.3d 185, 186 (Ind. Ct. App. 2017), *trans. denied*. Jester ran to a nearby home, where she encountered Andrew Moore (Moore) and called 911. In her 911 call, Jester identified Williams as the person who had shot her.

[6] Later that morning, Reedus' friend Cassandra Warmack (Warmack) and the mother of one of his children, Shaumbria Samuels (Samuels), picked up

Williams so that they could search for Reedus together. Samuels spotted Jester's van abandoned with Reedus' body slumped over in the front passenger seat. Williams placed a call to 911 but left before the police arrived. Warmack went to the police station to provide a statement. While she was waiting for officers to interview her, Williams called her on her cell phone. During the call, Williams initially denied being with Jester and Reedus. When Warmack mentioned that Jester had told the police that Williams had pumped gas into her car just before the shooting, Williams responded that Jester was lying and that she had pumped her own gas.

[7] Jester's van was searched. No fingerprints of evidentiary value were found inside or outside the van, and Williams' DNA was not found on any of the items recovered from the van. Four spent shell casings from a .38 caliber weapon were found in the van. Beginning at 6:42 a.m. on December 2, 2013, Jester's sister, Tasharra Jester (Tasharra), received a series of phone calls from Williams. In one call, Williams simply whispered, "I'm sorry." (Transcript Vol. XI, p. 180). In another call, Tasharra asked Williams why he had killed her sister, and Williams responded, "Your sister not dead [sic]." (Tr. Vol. XI, p. 185).

[8] On December 3, 2013, following neck surgery, Jester was released from the hospital and gave a statement to the lead detective, Lorenzo Davis (Detective Davis) of the Gary Police Department (GPD), in which she identified Williams as the person who had shot her and Reedus. Jester reported that Williams had shot her with a gun that had a cylinder or circular part and that, after the gun

jammed, he had poured the bullets from the gun out into his hand. On December 4, 2013, Williams contacted his acquaintance Stephen Johnson (Johnson) and asked if he could stay with him. Johnson declined but found Williams a room at the Mosley Hotel in Gary and drove him there. Before Williams got into Johnson's car, Johnson asked Williams if he had any weapons. Williams denied that he was armed, and Johnson drove him to the hotel. Upon arrival, Williams told Johnson that he had no identification, so Johnson used his own identification to rent a room for Williams. Johnson escorted Williams to the rented room, where he saw that Williams had a small black gun. Although Johnson was upset that Williams had lied to him about being armed, he asked Williams if he was planning on selling the gun. Williams told Johnson, "No, you don't want that one." (Tr. Vol. XI, p. 108).

[9] When Detective Davis initially made telephone contact with Williams, he denied being with Reedus. Detective Davis uncovered surveillance footage of Reedus and Williams entering a bar in Gary before Reedus was shot. Both men appeared to be highly intoxicated. Reedus dropped a large wad of money which Williams picked up and returned to him.

[10] On December 5, 2013, the State filed an Information, charging Williams with Reedus' murder, the attempted murder of Jester, carjacking, aggravated battery, battery by means of a deadly weapon, battery resulting in serious bodily injury, and criminal recklessness. Williams was subsequently located by law enforcement at the Mosley Hotel. On December 6, 2013, officers of the GPD's SWAT team, working in conjunction with deputies of the U.S. Marshal's

Service, breached the door of Williams' hotel room and located him inside. After Williams was in custody, Detective Davis left the scene to apply for a search warrant for the hotel room. After Detective Davis left the hotel but before the search warrant was procured, a black semi-automatic .38 caliber handgun was found under the mattress in Williams' room. After the search warrant was procured and Detective Davis learned of the handgun, he called crime scene investigator Michael Equihua (Detective Equihua) to the hotel solely to recover the handgun found in Williams' hotel room and to take photographs of the hotel room scene, which Detective Equihua did. Williams' identification and cell phones were found in the hotel room. On December 7, 2013, Detective Davis interviewed Williams, who stated that he had been consuming alcohol and had no memory of the relevant timeframe. Despite his lack of memory, Williams adamantly maintained that he had not killed Reedus.

[11]  While Williams was housed in the jail in Lake County, he spoke to fellow inmate Kent Carr (Carr) three times about witness tampering. Although Williams never mentioned a specific name, he asked Carr what would happen if the female star witness in his case did not attend his trial or came up missing. Williams told Carr that he had a friend "finessing" the woman. (Tr. Vol. XI, p. 69). While Williams was at the jail, a letter was found during an administrative search of his cell in which he had written the following:

> I need you to stand on the bird who's singing. Feel me? Last thing is 2 nite. I rather for you 2 game her and get some paper outta tha bitch. Convince her not to come to trial and recant her statement. Do what you got to do so she will not show and so

she will not be able 2 be contacted when it's time to go to the box.

(Tr. Vol. X, p. 92). After this letter was intercepted, Williams' jailhouse writing privileges were revoked. Thereafter, Williams asked inmate Jason Kidd (Kidd) for writing materials. Williams told Kidd about the first letter that had been found and stated that the "little bird" was the only strong evidence the State had against him. (Tr. Vol. XII, p. 59). Williams commented to Kidd that "he had already . . . tried to whack her, but he fucked up and hit her in the neck." (Tr. Vol. XII, p. 59). A second letter sent by Williams was intercepted by jail personnel in which Williams mentioned his then-current trial date and told the addressee that "I need you to stop or finesse the lil bird . . . Just know if you perform properly for me, I'll return the favor." (Tr. Vol. X, pp. 93-94).

[12] On February 27, 2015, the State entered into a plea agreement with Williams whereby he would plead guilty to the murder and attempted murder charges and would receive concurrent terms of fifty-five and thirty years, respectively. On April 10, 2015, after hearing victim impact testimony from Jester, the trial court rejected Williams' plea agreement. The trial court observed that he was "not comfortable on the 30 years concurrent term, because that gives Mr. Williams a pass for shooting [Jester]." *Id.* at 187.

[13] On July 7, 2015, Trial Counsel filed a motion to suppress the handgun that had been found in Williams' hotel room, arguing that it had been found pursuant to an illegal warrantless search. On July 31, 2015, after a hearing, the trial court denied the motion to suppress. As part of its ruling that the gun evidence was

admissible, the trial court found that a U.S. Marshal had lifted the mattress and discovered the handgun, not an officer of the GPD or the Lake County Sheriff's Department; Detective Davis had no knowledge of the gun when he applied for and was granted the hotel search warrant; and there was no police misconduct on the part of the GPD to be deterred through application of the exclusionary rule. The trial court granted Williams' request to certify its order denying his motion to suppress for interlocutory appeal, but this court declined to accept jurisdiction. On January 11, 2016, after the denial of the motion to suppress, Trial Counsel deposed several officers regarding the discovery of the handgun and received discovery of dispatch calls made during the investigation. Trial Counsel filed a second motion to suppress the handgun evidence, arguing that the handgun had actually been found by an officer of the GPD. On March 3, 2016, the date set for a hearing on Williams' second motion to suppress the handgun evidence, Trial Counsel withdrew the motion on Williams' behalf based on the State's agreement not to seek to admit the handgun evidence at trial.

[14] On April 4, 2016, the same trial court judge who had rejected Williams' plea agreement convened Williams' first jury trial. On April 13, 2016, the trial court found that the jury was deadlocked and declared a mistrial. On September 8, 2016, Williams moved for a change of judge. The trial court denied Williams' motion. After Williams' mistrial, the State obtained DNA testing results showing that the blood of Andre Woods (Woods), an associate of Reedus and Williams, was recovered from Jester's van.

[15] On November 28, 2016, the trial court convened Williams' second jury trial, which lasted a total of ten days. Trial Counsel pursued a defense strategy of calling Jester's credibility into question, highlighting what Trial Counsel argued was an incomplete and ineffective investigation, and suggesting that others, including Woods, could have been the culprit. Moore testified about encountering Jester on December 2, 2015. Jester testified that Williams shot her and Reedus and identified him in open court. Trial Counsel cross-examined Jester regarding inconsistencies among her police statement, her deposition, her first trial testimony, and her second trial testimony regarding the details of the timing of Williams' 'you saw my face' statement, whether she jumped or was pulled from her van, whether Moore had been asleep or standing when she encountered him, and her varying descriptions of the gun as a revolver or a semi-automatic, among other topics. The coroner testified that Reedus had been shot twice in the head. Both of those bullets were recovered from Reedus' body. Reedus had also been wounded by either one or two bullets on his left and right thigh.

[16] After the coroner, four other officers involved in the investigation and evidence collection testified and were cross-examined at length by Trial Counsel, particularly about items of evidence that could have been collected, or testing that could have been done, but were not. Trial Counsel's cross-examination of evidence technician Captain Milan Trisic (Captain Trisic), who processed Jester's van at the police garage, was representative of her style and the breadth of questioning. After Captain Trisic acknowledged that he had taken no

measurements in the van, Trial Counsel asked him individual questions about whether he had taken measurements of the angles of the van seats as they were found, the distance between the last bench seat of the van and the front seat, or between the bucket seats. After showing Captain Trisic photographs of the interior of Jester's van, which was strewn with trash and Jester's family's possessions, Trial Counsel individually questioned him about a beer cap, a pack of cigarettes, a straw, a wrapper in the door panel of the front passenger side, a possible CD case holder, a green cup, a cup next to the green cup, a cigarette butt, the location of the shell casings in the van, a blue and orange hat, a cell phone which Trial Counsel confirmed with the witness had not been swabbed for fingerprints or DNA, a soft drink can, and a folder containing papers found in the driver's side door. Trial Counsel also questioned him about the fact that police procedure had not been followed when moving the van to the police garage and about the circumstances surrounding the collection of a shell casing which tended to show that it had been collected in an unstandardized manner.

[17] The State's eighth witness was Detective Equihua. During her direct examination of Detective Equihua, the Deputy Prosecutor honored her agreement not to elicit any testimony regarding the gun found in Williams' hotel room. On cross-examination, Trial Counsel questioned Detective Equihua at length about items in Williams' hotel room and areas and items that were not searched, recovered, fingerprinted, or tested for DNA, including a bag on the nightstand, a black bag on the refrigerator, a pizza box, the remote

control, the nightstand, the room's dresser drawers, and the bathroom. The following exchange then took place:

> Trial Counsel: Okay. Now, if I understand you correctly. It's your testimony that you, in fact, didn't do any – didn't do any of those things. And I mean – by that, I mean looking inside the drawers or inside of bags or anything like that because you had been advised of two different things, one, that a determination had already been made as to who had been in the room?
>
> Det. Equihua: Correct.
>
> Trial Counsel: And then the second reason was because Detective Davis didn't ask you to?
>
> Det. Equihua: No, ma'am. I was just instructed to take the photographs inside the room and that's what I did.
>
> Trial Counsel: Okay. So certainly if there was any evidence of exculpatory value – you understand what I mean by that?

(Tr. Vol. VII, pp. 39-40). The Deputy Prosecutor objected, and, outside the presence of the jury, argued that Trial Counsel was misleading the jury by creating a false impression that Detective Davis had directed Detective Equihua to perform a general search of the hotel room when Detective Equihua had only been called to the scene to collect the handgun and take photographs. The Deputy Prosecutor had held her objection until she felt that Trial Counsel was speculating before the jury about places evidence might have been found, such as the bathroom and the dresser drawers. It was the State's position that Trial

Counsel had opened the door to the gun evidence. In response, Trial Counsel argued that she had not opened the door through her questioning, as she had pursued similar lines of questioning through each crime scene investigator and her questions were merely meant to show that Detective Equihua had discretion in what evidence to collect from the hotel room. The trial court ruled that Trial Counsel had created a misleading impression about the nature of Detective Equihua's duties at the hotel scene, opening the door to evidence that the gun was found in the hotel room.

[18] The parties then argued regarding the limits of the remedy necessary to correct the misimpression, with the Deputy Prosecutor arguing that ballistics testing evidence was also admissible following the admission of evidence that the gun was found and Trial Counsel arguing for the evidence to be limited to the fact that Detective Equihua had been called to the hotel to collect a gun from Williams' room. During the extensive argument on the scope of the remedying evidence, Trial Counsel requested an evidentiary hearing on the second motion to suppress the handgun because, she argued, without such a hearing, "[t]here is nothing for the Court of Appeals – when we talk about whether this is a reversible issue or not, there's nothing for them to look at." (Tr. Vol. VII, p. 73). The trial court denied the motion for a suppression hearing. Trial Counsel represented that she would make an offer of proof with witnesses but did not do so. Trial Counsel moved for a mistrial, which motion was denied. After hearing multi-part, extensive argument on remedy evidence, the trial court further ruled that evidence concerning ballistics testing done on the gun was

also admissible, as not allowing that evidence would create a second misimpression before the jury that the State had failed to investigate the gun and its possible link to the offenses. When the cross-examination of Detective Equihua continued, Trial Counsel questioned him about whether he had been called to the hotel to recover a weapon and if searching other places in the hotel room would have been to find other evidence apart from the gun. Trial Counsel also questioned Detective Equihua at length about many items that could have had DNA or other evidence on them that were not recovered from Jester's van, another scene he had been involved in searching and documenting.

[19] After Detective Equihua's and the SWAT team leader's testimony was presented to the jury, Detective Davis testified and was cross-examined by Trial Counsel for nearly two days regarding the details of the investigation. Trial Counsel probed Detective Davis about the fact that he had lost his detective's file for the case which contained the cell phones found in Williams' hotel room, the emergency warrants he used to procure preliminary cell phone data, and items which he had not turned over to the State or the defense. Trial Counsel also posed questions about avenues of evidence which Detective Davis had not explored, including, among many others, attempting to procure surveillance footage from businesses around the scene of the shooting, the gas station where the group stopped prior to the shooting, or the bar where Reedus and Williams had been before the shooting; collecting clothing from Jester and others; canvassing around Moore's home; obtaining a registration slip from the Mosley Hotel; or obtaining Williams' cell phone GPS information. Trial Counsel also

inquired why Detective Davis had returned Jester's cell phone, which had been found in her van, without searching it; why he had not investigated the inconsistencies in the details of Jester's statements or obtained a copy of her 911 call; why he had not followed up on information he gleaned from Warmack's recorded statements when she was alone awaiting her police interview and Williams called her; and why he had not investigated Samuels or any of the other people Reedus had reportedly been with prior to his murder. Detective Davis also admitted on cross-examination that he used the wrong VIN number on the search warrant application for Jester's van and that there was a discrepancy on the scene login/logout sheet about what time he left the scene.

[20] Williams' police interview was published to the jury during Detective Davis' testimony. The two letters Williams wrote from jail were also admitted, and a handwriting expert concluded that it was probable that Williams had written them. After testimony from the fingerprint examiner and a medical doctor, Trial Counsel continued to argue that the trial court should not admit any ballistics testimony, and she filed a motion to reconsider the trial court's ruling allowing that evidence to come in which the trial court denied. After the presentation of the State's DNA evidence, the Deputy Prosecutor offered the testimony of the State's ballistics expert, Lieutenant Henry Hatch (Lieutenant Hatch). Trial Counsel objected to the admission of the ballistics evidence but did not offer any specific grounds for her objection. Testing showed that one of the bullets recovered from Reedus' body and all of the four spent casings found in the van were fired by the handgun found in Williams' hotel room.

Lieutenant Hatch was unable to conclude that the other bullet recovered from Reedus' body was fired from that gun, but he was certain that the bullet had been fired from a .38 caliber firearm. Testing also showed that, consistent with Jester's testimony, one of the bullets in the magazine of the gun found in Williams' hotel room had been struck by the firing pin of the gun but had not fired. After the presentation of the ballistics evidence, Carr, Johnson, Tasharra, Warmack, and Kidd testified about their conversations and interactions with Williams. During Warmack's testimony, Trial Counsel procured a ruling from the trial court that evidence that Woods' car was parked outside Reedus' house on the morning of December 2, 2013, was admissible.

[21] During the defense's case-in-chief, Trial Counsel presented additional evidence tending to show that the State had not conducted a professional investigation, Williams had called 911 when he, Warmack, and Samuels had found the van and Reedus' body, the jailhouse conversations Carr and Kidd had testified to would have been impossible if jail policies had been followed, and that Woods' car had been left in front of Reedus' home. During her closing remarks, the Deputy Prosecutor relied upon Jester's first-hand testimony, the handgun and ballistics evidence, Williams' jailhouse letters, and his conversations with Kidd and Carr in arguing Williams' guilt. Trial Counsel emphasized the lack of thoroughness in the investigation, attacked Jester's, Kidd's, and Carr's credibility, and argued that Woods could have committed the offenses. Trial Counsel acknowledged that a gun had been found in Williams' hotel room but

argued to the jury that fact did not make a definitive case for his guilt because the ballistics evidence could not detect who fired a gun.

[22] The jury deliberated for approximately four hours and asked one question unrelated to either the murder or the attempted murder charges. The jury found Williams guilty on all counts. The trial court entered judgment of conviction only on the murder, attempted murder, and carjacking verdicts. On January 12, 2017, the trial court sentenced Williams to an aggregate sentence of 120 years.

[23] Williams pursued a direct appeal of his convictions. Appellate Counsel presented one argument on appeal, namely, that the trial court erred when it denied Williams' motion for change of judge between his first and second trials. On October 13, 2017, another panel of this court concluded that Williams' motion for change of judge had not been timely filed and that the trial court judge was not required to recuse himself *sua sponte* because he had not demonstrated any actual bias or prejudice against Williams in rejecting the plea agreement. *Williams*, 86 N.E.3d at 189. Accordingly, the court affirmed Williams' convictions. *Id*.

[24] Williams filed a *pro se* petition for post-conviction relief which was amended on March 12, 2019, after Post-conviction Counsel appeared. In his petition, Williams alleged that Trial Counsel was ineffective for opening the door to the handgun evidence and Appellate Counsel was ineffective for failing to challenge the trial court's ruling admitting the handgun and ballistics evidence

in response to Trial Counsel opening the door. On June 20, 2019, the post-conviction court held a hearing on Williams' petition. The post-conviction court took judicial notice and/or admitted into evidence the record on direct appeal of Williams' second jury trial. Post-conviction Counsel offered into evidence the transcripts of Williams' mistrial, but the State objected on relevancy grounds. The post-conviction court sustained the State's objection, excluded the mistrial transcripts, but ultimately allowed Williams to file the mistrial transcripts as an offer of proof in the post-conviction proceedings.

[25] Trial Counsel testified at the post-conviction hearing. Trial Counsel, who was a former deputy prosecutor, had represented defendants in over forty felony trials, ten of which were murder trials. Trial Counsel had filed the second motion to suppress the handgun evidence after deposing officers involved in the investigation and after concluding that there was evidence contradicting the trial court's suppression finding that a U.S. Marshal had found the gun at issue. Trial Counsel testified that her trial strategy had been to demonstrate to the jury that there was insufficient evidence that Williams had been the shooter and to highlight an allegedly incomplete and inadequate investigation by law enforcement. She had intended her cross-examination of Detective Equihua to demonstrate to the jury that there had been multiple pieces of evidence in the motel room that had not been collected or investigated. According to Trial Counsel, "[a] lot" of her strategy was to attack the police investigation, "so it really played into our defense." (PCR Transcript p. 38). Trial Counsel

acknowledged that "we did not have a ruling on the second hearing, there was nothing in the record to preserve the appeal right." (PCR Tr. p. 39).

[26] Appellate Counsel, who had been practicing law since 1975, also testified at the post-conviction hearing. During his time in private practice and his tenure with the public defender's office since 2004, Appellate Counsel had prosecuted between fifty and 100 appeals. Appellate Counsel had assisted Trial Counsel during the second trial in crafting a strategy to address the opening of the door to the handgun evidence. After Williams was convicted and Appellate Counsel received the appeal, he reviewed the record and determined that the issues of whether Trial Counsel had opened the door and whether the trial court's admission of the handgun evidence had exceeded the scope of the evidence necessary to remedy the opening of the door had not been preserved. Appellate Counsel based that conclusion on his determination that, because Trial Counsel had withdrawn the second motion to suppress, there was no trial court ruling that the handgun evidence was inadmissible; the State had not conceded that the handgun evidence was constitutionally infirm, but, rather, had agreed not to introduce the evidence out of ethical concerns; after the trial court had denied a hearing on the second, in-trial motion to suppress, Trial Counsel had offered to make an offer of proof but then did not; and Trial Counsel had argued in the trial court that without a ruling the issue would not be preserved for appeal, a position that Appellate Counsel felt he could not reverse on appeal. Appellate Counsel had also considered the facts that Trial Counsel had never re-asserted the grounds for the first motion to suppress or incorporated any of the evidence

from the first motion to suppress into the trial record and that, when the cross-examination of Detective Equihua finally resumed, Trial Counsel had questioned him in depth about the handgun, which Appellate Counsel thought weighed in favor of waiver. Lastly, Appellate Counsel's review of the trial record revealed that, when the State offered photographs of the handgun during re-direct examination of Detective Equihua, Trial Counsel had not objected on specific grounds. It was Appellate Counsel's opinion that the additional evidence Trial Counsel had developed from deposing the officers involved in the investigation about who found the handgun and receiving discovery about radio dispatches contemporaneous to the discovery of the handgun needed to be presented in an offer of proof in order to preserve the issue.

[27] On April 7, 2020, the post-conviction court denied Williams' petition. As to Williams' claim that Trial Counsel had been ineffective, the post-conviction court found that Williams had failed to show that Trial Counsel's performance fell below an objective standard of reasonableness given Trial Counsel's experience as a trial attorney, her vigorous cross-examination of the State's witnesses in furtherance of her trial strategy to show the insufficiency of the evidence and poor police investigation, her strenuous efforts to argue to the trial court that she had not opened the door to the handgun evidence, and her efforts to preserve the issue of the admission of the handgun evidence for appeal. The post-conviction court found that Williams had also failed to demonstrate that he had been prejudiced by Trial Counsel's performance in that other substantial evidence supported his guilt, namely the testimony of Jester, Tasharra,

Johnson, Carr, and Kidd as well as evidence that Williams had written the "stand on the bird" and "last thing is 2 nite" letter. (Tr. Vol. X, p. 92). Given this evidence, the post-conviction court concluded that Williams had failed to show that, despite the claimed error by Trial Counsel, the outcome of his trial would have been different. The post-conviction court additionally rejected Williams' argument that the fact that his first trial had resulted in a mistrial should be considered as evidence of prejudice resulting from Trial Counsel's performance because there was no evidence regarding why the jury failed to reach a decision and, thus, any reasons suggested by Williams or the State were purely speculative.

[28] The post-conviction court also denied Williams relief on his ineffective assistance of appellate counsel claim, concluding that Williams had failed to make the required showings that Appellate Counsel's performance was below professional norms or that Williams had been prejudiced. In support of its performance conclusion, the post-conviction court found that Appellate Counsel was experienced, had reviewed the trial record, and had made the decision that the only viable issue for direct appeal was the change of judge issue. The post-conviction court found that Appellate Counsel was aware of the handgun evidence issue but that Appellate Counsel had determined that the issue had not been properly preserved for appeal. In support of the prejudice prong of its analysis, the post-conviction court found that even if the handgun evidence issue had been properly preserved and challenged on appeal, the outcome of Williams appeal would not have been different because there was

nothing in the record suggesting that the trial court had abused its discretion in admitting the evidence. The post-conviction court also found that, due to the substantial evidence of Williams' guilt apart from the handgun evidence, any error in the admission of the handgun evidence would likely been found to have been harmless on direct appeal.

Williams now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Williams contends that the post-conviction court erred when it concluded that he received the effective assistance of trial and appellate counsel. Petitions for post-conviction relief are civil proceedings in which a petitioner may present limited collateral challenges to a criminal conviction and sentence. *Weisheit v. State*, 109 N.E.3d 978, 983 (Ind. 2018). In such a proceeding, the petitioner bears the burden of establishing his claims by a preponderance of the evidence. *Id*. When a petitioner appeals from the denial of his petition for post-conviction relief, he stands in the position of one appealing from a negative judgment. *Hollowell v. State*, 19 N.E.3d 263, 269 (Ind. 2014). To prevail on appeal from the denial of post-conviction relief, the petitioner must show that the evidence "as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the [PCR] court." *Id*. In addition, where a post-conviction court makes findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6), we do not defer to its legal conclusions, but we will

reverse its findings and judgment only upon a showing of clear error, meaning error which leaves us with a definite and firm conviction that a mistake has been made. *Id*.

## II. *Strickland*

[31] We evaluate ineffective assistance of trial and appellate counsel claims under the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on such a claim, a petitioner must show that "1) his counsel's performance was deficient based on prevailing professional norms; and 2) that the deficient performance prejudiced the defense." *Weisheit*, 109 N.E.3d at 983 (citing *Strickland*, 466 U.S. at 687). In order to demonstrate sufficient prejudice, the petitioner "must show that there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. (citing *Strickland*, 466 U.S. at 694). A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id*. A petitioner's failure to satisfy either the 'performance' or the 'prejudice' prong of a *Strickland* analysis will cause an ineffective assistance of counsel claim to fail. *Taylor v. State*, 840 N.E.2d 324, 331 (Ind. 2006).

## III. *Effectiveness of Trial Counsel*

### A. *Admission of Evidence*

[32] Before reaching the merits of Williams' effectiveness of trial counsel claim, we first address the issue of whether the trial court abused its discretion when it excluded the transcript from Williams' mistrial, ruling that it was irrelevant. The admission or exclusion of evidence is within the post-conviction court's

sound discretion; therefore, we defer to the post-conviction court and will not disturb its ruling unless it abused its discretion. *Conner v. State*, 711 N.E.2d 1238, 1258 (Ind. 1999).

[33] The handgun evidence was not admitted at Williams' first trial which ended in a hung jury, but it was admitted at Williams' second trial that ended in guilty verdicts. Williams argues that, because the evidence presented at both trials was largely the same apart from the admission of the handgun evidence, the transcript of his mistrial was relevant to the consideration of whether he was prejudiced by Trial Counsel's performance at his second trial. In support of his argument, Williams provides us with the following quote from our supreme court's decision in *Dowdell v. State*, 720 N.E.2d 1146, 1152 (Ind. 1999): "The fact that the first trial ended in a hung jury suggests that, at least in the mind of some jurors, there was a reasonable doubt surrounding [defendant's] guilt." At Dowdell's first trial on felony murder, attempted murder, and other charges, his trial counsel failed to file a timely witness list, resulting in Dowdell's alibi witnesses being excluded. *Id*. at 1149. That trial ended in a hung jury. *Id*. at 1150. Dowdell's trial counsel did not seek reconsideration of the trial court's ruling until the morning of his second trial, and the trial court again excluded his alibi witnesses. *Id*. Dowdell's second trial resulted in guilty verdicts. *Id*. at 1149. Dowdell argued that his trial counsel was ineffective for failing to timely file a witness list and/or seek timely reconsideration of the trial court's ruling, but the post-conviction court denied relief, based partially on its reasoning that the fact that Dowdell's first trial had ended in a mistrial demonstrated he had

not been gravely prejudiced by his counsel's performance. *Id*. at 1151. Our supreme court held that this prejudice conclusion was clearly erroneous, finding the fact of a hung jury to be suggestive that reasonable doubt existed as to Dowdell's guilt "at least in the mind of some jurors." *Id*. at 1152. However, the *Dowdell* court went on to reason that additional alibi witnesses may have swayed other jurors, and that "[o]ne cannot conclude from a prior hung jury that as a general proposition there is no reasonable possibility that newly presented evidence would affect the result." *Id*. at 1151-52. Therefore, we conclude that a more full reading of *Dowdell* reveals that it does not stand for the proposition, as Williams argues, that the fact that a previous trial resulted in a hung jury is always relevant to an evaluation of prejudice under *Strickland*, much less that it is dispositive that prejudice has positively been established. Rather, *Dowdell's* holding is more properly characterized as being that a lack of prejudice may not be presumed by the fact of a prior hung jury.

[34] After *Dowdell*, our supreme court decided *Beattie v. State*, 924 N.E.2d 643, 649 (Ind. 2010), in which it held that Indiana appellate courts would no longer review jury verdicts for consistency. In support of its holding, the *Beattie* court recognized that juries may reach seemingly logically inconsistent verdicts for a variety of reasons, such as a misunderstanding of the trial court's instructions, a choice to exercise leniency, compromise, a desire to end deliberations, to avoid all-or-nothing verdicts, or for other reasons. *Id*. at 648-49. Adopting United States Supreme Court jurisprudence citing "the general reluctance to inquire into the workings of a jury, and the possible exercise of lenity," our supreme

court held definitively that appellate courts would no longer attempt to read meaning into a jury's acquittal on some charges but not on others by reviewing verdicts for consistency. *Id.* at 649.

[35]     We conclude from the limited holding of *Dowdell* and the more recent *Beattie* decision that Indiana courts do not attempt to ascribe meaning to verdicts, or the lack thereof, rendered by juries in the manner suggested by Williams. A jury may fail to reach a verdict for many reasons that have nothing to do with the quantity or weight of the evidence or trial counsel's performance, and any attempt to discern its reasons is mere speculation. Therefore, the simple fact that a jury failed to reach a verdict in a prior trial, without more, is not relevant to a determination of whether a defendant was prejudiced for purposes of a *Strickland* analysis.

[36]     In arguing to the contrary, Williams draws our attention to a number of cases from federal jurisdictions suggesting that a hung jury can signal that the evidence of a case was close and, therefore, that the claimed error by counsel prejudiced the defendant at his second trial. However, we observe that the Seventh Circuit has taken a different approach. In *Ford v. Wilson*, 747 F.3d 944, 953-54 (7th Cir. 2014), Ford argued that he was prejudiced for purposes of a *Strickland* analysis in light of the fact that his first trial resulted in a hung jury and his trial counsel's failure to object to a prosecutor's remarks at his second trial was the only significant difference between the two trials. Finding that there was at least one additional significant difference between Ford's two trials because one of the State's witness's live testimony from the first trial was read

to the jury at the second trial, which proved to be less beneficial the defendant, the *Ford* court observed that

> [t]his simply underscores the need to be cautious in assigning critical significance to the failure of a different jury, which heard different evidence and argument, to reach agreement. Moreover, a jury may hang for any number of reasons, including the idiosyncratic views of a single juror. As a result, only in close cases should the fact of a prior hung jury lead to a finding of prejudice. This is not such a case because the evidence against Ford was far too strong for us to find prejudice under *Strickland*.

*Id.* at 954 (cleaned up). We find the Seventh Circuit's approach as applied in *Ford* to be more persuasive than the cases cited by Williams because it more closely aligns with current Indiana state jurisprudence voicing reluctance to divine the reasons for a jury's verdict.

[37]  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence[.]" Ind. Evidence Rule 401(a). Because the simple fact that a prior jury hung, without more, does not shed light on the jury's reasons for failing to reach a verdict, it does not tend to make any prejudice flowing from a claimed error on the part of trial counsel at a second trial more or less probable. Here, the post-conviction court excluded the transcript of Williams' mistrial based on the State's relevancy objection, which we conclude was not an abuse of its discretion.

*B. Performance*

Williams argues that his counsel's performance was deficient because "[o]pening the door to evidence which [T]rial [C]ounsel fought vigorously pretrial to exclude fell below an objective standard of reasonableness based upon prevailing professional norms." (Appellant's Br. p. 21). Thus, Williams argues that opening the door to evidence which had previously been the subject of attempts by Trial Counsel to suppress or exclude constitutes *de facto* deficient performance under *Strickland*. However, in *Garrett v. State*, 602 N.E.2d 139, 141-42 (Ind. 1992), our supreme court held that trial counsel's raising of the issue of a witness's prior inconsistent statement during the cross-examination of an officer resulting in the admission of the witness's damaging taped statement was not deficient performance, even though his trial counsel had previously moved to suppress the witness's statement. In reaching this conclusion, the court found that Garrett's counsel was pursuing a strategy of attempting to convey to the jury that both the witness's and the officer's testimony could be untruthful. *Id*. The court held that "[t]actical choices by trial counsel do not establish ineffective assistance of counsel even though such choices may be subject to criticism or the choice ultimately proves detrimental to the defendant." *Id*. at 142.

Here, Trial Counsel made a tactical choice to cross-examine Detective Equihua about areas not searched and items not collected in Williams' hotel room to develop Williams' defense strategy that the investigation was incomplete and ineffective. Our review of the record revealed that this was a strategy that Trial

Counsel pursued relentlessly across all the detectives, crime scene investigators, and technicians who worked on the instant investigation. The fact that Trial Counsel's pursuit of the chosen defense strategy resulted in the unintended consequence of the admission of evidence she had previously sought to suppress did not *per se* render her representation defective. *See id*.

[40] Williams also argues that Trial Counsel's performance was deficient because she failed to adequately prepare for her cross-examination of Detective Equihua. Williams did not raise this discrete claim in his petition for post-conviction relief, and, therefore, it is waived. *See* Ind. Post-Conviction Rule 1(8) ("All grounds for relief available to a petitioner under this rule must be raised in his original petition.); *Koons v. State*, 771 N.E.2d 685, 691 (Ind. Ct. App. 2002) ("The failure to raise an alleged error in the petition waives the right to raise that issue on appeal."), *trans. denied*. The trial court did not enter any findings or conclusions regarding Trial Counsel's level of preparedness for the cross-examination of Detective Equihua, and we decline to address that claim.

[41] Williams' last argument pertaining to Trial Counsel's performance is that the post-conviction court misapplied *Strickland* when it found that Trial Counsel had not performed deficiently because she had vigorously cross-examined other witnesses. Williams claims that this was a misapplication of *Strickland* because "counsel performing adequately in one regard does not prevent a finding that counsel performed deficiently in another regard." (Appellant's Br. p. 22). However, "effective assistance is determined according to the whole of the lawyer's performance and not just the strategy and performance at issue."

*Azania v. State*, 738 N.E.2d 248, 251 (Ind. 2000). In addition, it is well-settled that the nature and extent of cross-examination is a matter of trial strategy which we do not second-guess on appeal. *Myers v. State*, 33 N.E.3d 1077, 1101 (Ind. Ct. App. 2015), *trans. denied*. As observed above, one of Williams' line of defenses was to point out the incompleteness and ineffectiveness of the investigation. The post-conviction court's finding that Trial Counsel had vigorously cross-examined other witnesses was relevant to its assessment of how Trial Counsel performed as a whole in pursuit of that strategy and so was not a misapplication of *Strickland*. *See Azania*, 738 N.E.2d at 251. As such, Williams has not met his burden on appeal to establish that the post-conviction court's conclusion that Trial Counsel's performance was effective was clearly erroneous. *See Hollowell*, 19 N.E.3d at 269.

### C. Prejudice

[42] Even if Williams had established that Trial Counsel's performance in opening the door to the handgun evidence was deficient, he was also required to show that "there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different." *Weisheit*, 109 N.E.3d at 983. Reviewing courts have found insufficient *Strickland* prejudice even where counsel's performance led to the admission of damaging evidence if there was significant, additional evidence of the defendant's guilt. In *Drake v. State*, 563 N.E.2d 1286, 1288-89 (Ind. 1990), defense counsel had succeeded in having Drake's admissions to his wife excluded from his murder trial, only to open the door to that evidence during wife's cross-examination. The *Drake*

court found that, although trial counsel's performance had been deficient, Drake had failed to demonstrate sufficient prejudice, and no reversible error had occurred, in light of his more-detailed admissions made to two other witnesses. *Id*. at 1289. Likewise, in the earlier case of *Hill v. State*, 442 N.E.2d 1049, 1053-54 (Ind. 1982), our supreme court found an insufficient showing of prejudice flowing from trial counsel's inadvertent opening the door during cross-examination to previously-suppressed show-up identification evidence, where various other witnesses identified Hill pre-trial and in-trial as the person who had committed the robbery at issue.

[43] Here, the State presented significant and substantial evidence of Williams' guilt. Jester identified Williams as the person who shot her and Reedus, and that identification did not waver through her 911 call, her post-hospitalization interview with Detective Davis, her deposition, her first trial testimony, and her second trial testimony. Williams telephoned Jester's sister Tasharra and said "I'm sorry," and commented that Jester was not dead, something that the jury was free to infer he would have only known at that time if he had been present when she was shot. (Tr. Vol. XI, p. 180). Williams made incriminating statements to Carr and Kidd, and he wrote letters attempting to ensure that Jester did not appear for trial. Williams gave a contradictory statement after he was apprehended that he had no memory of the relevant timeframe but denied shooting Reedus, and he made a statement that Jester had pumped her own gas before the shooting, which placed him with the victims just prior to the offenses. In addition, Johnson testified that Williams had a firearm in his hotel

room, which was independent evidence from which the jury could infer that he possessed a weapon with which he shot Jester and Reedus. While another set of facts could have presented a closer case, given the quantum and quality of the other evidence indicating Williams' guilt, we cannot conclude that there was a reasonable probability that the jury's verdict would have been different without the admission of the handgun evidence or that the post-conviction court's conclusion in this regard was clearly erroneous.

[44] In arguing otherwise, Williams first contends that "the post-conviction court erred in not giving any weight to the prior hung jury." (Appellant's Br. p. 23). As we have already found that the bare fact that a prior trial resulted in a hung jury is not relevant to a trial court's determination of prejudice under *Strickland*, we find no clear error in the post-conviction court's refusal to accord it weight in its analysis.

[45] Williams further argues that even without consideration of the prior hung jury, he established that he was prejudiced by Trial Counsel's opening of the door to the handgun evidence because that evidence was especially strong and the State's case was weak. However, in order to prevail on appeal, Williams was required to demonstrate that the evidence "as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the [PCR] court." *Hollowell*, 19 N.E.3d at 269. Williams' argument essentially asks us to reassess the credibility of the witnesses and the weight of the evidence, but it does not demonstrate that the evidence as a whole pointed "unerringly and unmistakably" towards a finding of prejudice. *Id*. Given that Williams has

failed to meet his appellate burden of demonstrating a reasonable probability that the outcome of his trial would have been different absent Trial Counsel's performance, we find no clear error in the post-conviction court's denial of relief.

*IV. Effectiveness of Appellate Counsel*

[46] Williams challenges the representation afforded by Appellate Counsel, arguing that he "was ineffective for failing to challenge the trial court's ruling that the State could introduce the firearm and results of testing of the firearm in response to [T]rial [C]ounsel opening the door." (Appellant's Br. p. 27). The standard of review for ineffective assistance of appellate counsel claims is the same as that for trial counsel: the petitioner must show deficient performance and that the deficiency resulted in prejudice to him. *Hollowell*, 19 N.E.3d at 269. Ineffective assistance of appellate counsel claims generally fall into three categories, namely (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. *Id*. at 270. In order to show that appellate counsel was ineffective for failing to raise an issue on appeal, thus resulting in waiver for collateral review, a defendant must overcome the "strongest presumption of adequate assistance, and judicial scrutiny is highly deferential." *Reed v. State*, 856 N.E.2d 1189, 1195 (Ind. 2006). In evaluating the performance prong of the *Strickland* standard, we determine whether the unraised issues are significant and obvious from the face of the record and whether the unraised issues are clearly stronger than the raised issues. *Id*. In evaluating the prejudice prong of the *Strickland* standard, we determine whether the issues that appellate counsel

failed to raise would have been clearly more likely to result in reversal or an order for a new trial. *Id.* It is very rare that we find appellate counsel to be ineffective for failing to raise an issue on appeal, as the decision of what issues to raise is one of the most important strategic decisions made by appellate counsel. *Id.*

### *A. Performance*

[47] Here, Appellate Counsel chose to challenge the trial court's denial of Williams' motion for a change of judge after his first trial ended in a mistrial. Appellate Counsel testified at the post-conviction hearing that he reviewed the transcript of Williams' second trial, was aware of the handgun evidence issue, but decided to advance the change of judge issue because the handgun evidence issue was not properly preserved for review. Thus, Appellate Counsel's choice of issue was a strategic exercise of his professional judgment. Appellate Counsel's judgment was reasonable given that Trial Counsel had argued to the trial court that, without an in-trial hearing on the second motion to suppress, the suppression issue would not be properly preserved for review.

[48] More significantly, after the trial court denied the motion for an in-trial suppression hearing, Trial Counsel stated her intention to make an offer of proof, presumably to present the additional discovery she had obtained and the evidence gleaned from the depositions she took of law enforcement officers involved in the recovery of the handgun from Williams' hotel room. There is no such offer of proof in the record, and, thus, there was no factual basis in the record for a reviewing court to assess the issue. Contrary to Williams'

assertions, the Deputy Prosecutor did not concede that the handgun evidence was inadmissible; rather, she conceded only that she had ethical concerns about proceeding with the evidence. Although Williams directs our attention to a litany of other actions taken by Trial Counsel to address the trial court's ruling, he acknowledges neither Trial Counsel's in-trial concession that the issue was not properly preserved for appellate review nor the lack of an offer of proof regarding the basis for his second motion to suppress. A waived issue has no persuasive appellate value and, therefore, is not "clearly stronger" than another issue. *Reed*, 856 N.E.2d at 1195. Given the deference we accord to the strategic decisions of appellate counsel in the choice of issues and the waiver of Williams' preferred issue, Williams has failed to overcome the strong presumption that Appellate Counsel's performance was effective, and the post-conviction court's findings and conclusions are not clearly erroneous.

### B. Prejudice

[49] Even if we were to have found that Appellate Counsel had rendered deficient performance in failing to present the handgun evidence issue on direct appeal, we would not reverse Williams' convictions. In order to prevail on his claim of ineffectiveness of appellate counsel, Williams was required to show that the handgun issue was "clearly more likely to result in reversal or an order for a new trial." *Id.* Jester's consistent identification of Williams as the shooter, Williams' apology and comment to Tasharra, his statement to Warmack placing him with the victims just prior to the shooting, Williams' contradictory statements to Detective Davis about his memory of the relevant timeframe,

Williams' jailhouse discussions with Kidd and Carr indicating he wished to prevent Jester from appearing at trial, and his letters indicating the same all pointed strongly to his identity as the shooter. The State also presented Johnson's testimony that Williams had a small black gun in his hotel room. As we have already concluded in reaching our disposition of Williams' effectiveness of trial counsel claim, because of this considerable independent evidence of Williams' guilt, there was little probability that the admission of the handgun affected the outcome of Williams' trial. Because of this, we reach a similar conclusion regarding the likelihood of it being a successful appellate issue. Williams has failed to demonstrate that his chosen issue would have been more likely to result in a reversal on appeal. *See id*. Accordingly, the post-conviction court's determination that Williams was not prejudiced by Appellate Counsel's performance was not clearly erroneous.

## CONCLUSION

Based on the foregoing, we conclude that the post-conviction court's determination that Williams received the effective assistance of Trial Counsel and Appellate Counsel was not clearly erroneous.

Affirmed.

May, J. and Altice, J. concur